IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

ZOEY M. V. EVERETT B.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ZOEY M., APPELLEE,

V.

EVERETT B., APPELLANT.

Filed December 26, 2023.    No. A-23-271.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

Jeffrey White, of UNL Student Legal Services, for appellant.

No appearance for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## INTRODUCTION

Zoey M. filed a petition for a domestic abuse protection order against her former intimate partner, Everett B. An ex parte domestic abuse protection order was entered by the Douglas County District Court, and in response, Everett timely requested a hearing. Following the hearing, the district court affirmed the ex parte order. Everett appeals, arguing the evidence was insufficient. We affirm.

## BACKGROUND

### PETITION

On March 9, 2023, Zoey filed a "Petition and Affidavit to Obtain Domestic Abuse Protection Order" against Everett pursuant to Neb. Rev. Stat. § 42-924 (Cum. Supp. 2022). Zoey described three incidents of alleged abuse by Everett. The incidents were labeled as paragraphs

"A" through "C." We begin with the incident alleged in paragraph "B" since those facts preceded the incident described in paragraph "A" and provide some context for the later actions.

In paragraph "B," Zoey alleged that on March 9, 2023, at "0128," Everett came to her home at "1:28 in the morning" and "repeatedly knocked at [her] doors for around 30 minutes." She woke to "the tapping and instantly felt fear" and suspected it was Everett "due to him threatening to come to [her] home uninvited in the past." She stated that Everett also called her from a "no caller ID number approximately 22 times between 12:21 a.m. and 1:48 a.m." Zoey said she was with another person at the time, and they were both "physically shaking." The incident "also led [her] to tears." She felt "frozen" and feared that Everett "had a gun or had the intention of breaking into the house." The police were called, and Everett was taken into custody. Zoey stated that this "experience caused [her] to lose sleep in fear that [Everett] would retaliate."

In paragraph "A," Zoey alleged that at "0606" that same day, Everett left her a voicemail "from a no caller ID number that lasted about a minute and 30 seconds." She stated that "some alarming things" were said, including, "'All I wanted to do was talk so whatever karma is a bitch,'" and, "'You'll get yours I promise you that.'" This caused Zoey "a sense of fear that led [her] to shake and created anxiety." She feared "in that moment" that she made Everett mad enough that he would "try to seek revenge by entering [her] house and violently yell or create an argument like he has in the past." She feared he would "take it to the extent of killing [her]." "In this voicemail [Everett] also called [her] numerous names."

In paragraph "C," Zoey alleged that in the "Summer of 2022," while in Everett's apartment, the parties were arguing, and she remembered Everett "immediately becoming angry to the point where he was about an inch from [Zoey's] face yelling at the top of his lungs." She recalled "uncontrollably crying while he grabbed [her] shoulders tightly and continued yelling." When Zoey attempted to leave, Everett "attempted to restrain [her] at the door by pressing his body weight against [her]." This caused Zoey a "great amount of stress and [she] ran out the door." Everett followed her down the stairs and "called [her] names such as 'trailer trash'" and told her that she would "never amount to anything in [her] life." She claimed the experience was only "one of some in which [Everett] . . . tried to restrain [her] from leaving his presence."

### Ex Parte Order and Request for Hearing

On March 9, 2023, the district court issued an ex parte domestic abuse protection order, ordering that Everett stay away from Zoey's residence and workplace. The order also prohibited Everett from communicating with Zoey, "imposing any restraint upon the person or liberty of [Zoey]," "threating, assaulting, molesting, attacking, or otherwise disturbing the peace of [Zoey]," or possessing or purchasing a firearm. On March 10, Everett filed a "Request for Hearing – Protection Order," which the court granted.

### Show-Cause Hearing and District Court Order

On April 6, 2023, the district court held a hearing on the matter; Zoey and Everett each appeared without counsel. The court received Zoey's petition and affidavit into evidence after Zoey testified that the allegations contained therein were true and accurate. Zoey did not provide any further evidence or testimony when given the opportunity.

Everett provided testimony at the hearing in response to Zoey's allegations. Everett confirmed to the district court that on March 9, 2023, he called Zoey 22 times between 12:21 a.m. and 1:48 a.m. and knocked on her door for an extended period. Everett stated that he did not say anything while he was knocking on Zoey's door. He stated that when law enforcement arrived, he was standing near his vehicle on the sidewalk. He was "taken into custody for two counts of disturbing the peace and a suspected DUI."

After Everett was released on bond, he left Zoey a voicemail from "a no-caller [ID] number." When the district court asked Everett why he did that, Everett responded that Zoey "would periodically unblock . . . and block [him] . . . so, a lot of the times that would be the only way [he] could get into contact with her." The court then asked why he needed to contact Zoey if she had blocked him, to which he responded that he was "not really sure," that he "had some clouded judgement at the time," and was "frustrated with how things went."

When asked by the district court what of paragraph "C" was true, Everett responded, "the yelling and the argument." But he denied touching Zoey during the incident or blocking her from leaving the room. When asked why Zoey would allege that Everett did these things, Everett stated that he was not sure and that she either "doesn't remember the event clearly or decided to perjure herself."

Everett also gave prepared remarks to the district court, which included two clarifications related to Zoey's petition, an apology to Zoey, and some "missing context . . . from the situation." First, Everett implied that Zoey's fear that he had a gun during the March 9, 2023, incident was unreasonable because he alleged that she knew he did not have access to firearms because of a "mental health crisis [he] went through [in] September." He also again denied touching Zoey during the incident described in paragraph "C."

Everett then stated that he wanted to apologize to Zoey and acknowledged that he should not have gone to her home. He stated he "did not go there to start a fight or to argue or to scare anyone," but that he "just wanted to get closure." Everett informed the district court that one of Zoey's friends had recently informed him that Zoey was seeing someone new. He stated that in the week prior to the March 9th incident, Zoey represented to him that she was not seeing someone new. After "hearing [the] news, [he] just wanted some closure," so he attempted to reach Zoey by phone and then went to her house. He stated that he was "wrong and [he took] full responsibility."

Everett also stated that he wanted to apologize for the voicemail he left Zoey. He was "surprised [Zoey] called the cops on [him]." He felt betrayed and was upset with the "trouble that these events got [him] into." He reiterated that he understood that his actions were his fault but again said there was "a lot of missing context." He stated that the "situation was really the culmination of a month and a half of gaslighting that [Zoey] put [him] through."

Everett stated that in January 2023, Zoey ended their relationship. He alleged that during that month, he "made strides with [his] mental health," and when Zoey saw this, she "wanted to be in [his] life again." However, Zoey began distancing herself from Everett again shortly thereafter. Everett stated that this showed the "manipulation and control tactics that [Zoey] would employ against [him]." Throughout the month of February, the parties saw each other once or twice a week. According to Everett, "[e]ach time in the month of February that [they] met up[,] [he] was always expected to do things for [Zoey]." He stated that at the time, he did not realize he

"was being manipulated and used." He claimed that Zoey knew if Everett became aware she was seeing someone else, he would no longer do things for her anymore.

Everett further testified that he did not understand why Zoey "would periodically block [him] and unblock [him] on things and only speak to [him] when she needed something." Everett claimed this caused his mental health to spiral. He went on to describe his recent mental health diagnosis and informed the court that he had been taking steps to improve his mental health, such as attending therapy and AA meetings, as well as obtaining employment. Finally, he stated that Zoey knew of his fragile mental state and manipulated him anyway, and that he hoped this would be the last time he saw Zoey.

The district court then asked Zoey whether she was requesting that the ex parte order continue, to which she responded, "Yes. Yes, Your Honor." Zoey declined to add to the testimony. The court then stated that it found by a preponderance of the evidence that the ex parte order should be affirmed. The court informed the parties that the order would be in effect for a year from the date the ex parte order was entered. That same day, the court entered an "Order Affirming Domestic Abuse Protection Order" consistent with its oral pronouncement.

Everett appeals.

## ASSIGNMENTS OF ERROR

Everett assigns that the evidence was insufficient to (1) support the continuation of the domestic abuse protection order, (2) establish that he threatened or caused bodily injury to Zoey, and (3) establish that he communicated a credible threat of bodily injury to Zoey. No responsive brief was filed by Zoey.

## STANDARD OF REVIEW

A protection order pursuant to § 42-924 is analogous to an injunction. Thus, the grant or denial of a protection order is reviewed de novo on the record. In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Garrison v. Otto*, 311 Neb. 94, 970 N.W.2d 495 (2022).

## ANALYSIS

Although Everett assigns three separate errors on appeal, he makes only one argument in the body of his brief, seemingly because his assigned errors all relate to the sufficiency of the evidence. We likewise address all three assigned errors together.

Under the Protection from Domestic Abuse Act, Neb. Rev. Stat. § 42-901 et seq. (Reissue 2016 & Cum. Supp. 2022), "[a]ny victim of domestic abuse may file a petition and affidavit for a protection order[.]" § 42-924(1)(a). Section 42-925(1) provides that a domestic abuse protection order may be issued ex parte "if it reasonably appears from the specific facts included in the affidavit that the petitioner will be in immediate danger of abuse before the matter can be heard on notice." A respondent may request a "show-cause hearing" within 10 business days after service

of the protection order. *Id*. Here, Everett timely requested a hearing and, following the hearing, the court affirmed the protection order.

When deciding whether to affirm or rescind an ex parte domestic abuse protection order, the question of whether domestic abuse occurred is a threshold issue, and absent abuse as defined by § 42-903, the protection order may not remain in effect. See *Garrison v. Otto, supra*. Everett argues that there was not sufficient evidence to show that he subjected Zoey to abuse. Section 42-903 defines, in pertinent part, the following terms:

(1) Abuse means the occurrence of one or more of the following acts between family or household members:

(a) Attempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument;

(b) Placing, by means of credible threat, another person in fear of bodily injury. For purposes of this subdivision, credible threat means a verbal or written threat, including a threat performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct that is made by a person with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family . . . ; or

(c) Engaging in sexual contact or sexual penetration without consent as defined in section 28-318;

. . .

(3) Family or household members includes . . . persons who are presently involved in a dating relationship with each other or who have been involved in a dating relationship with each other. . . .

The petitioner at a show-cause hearing following an ex parte order has the burden to prove by a preponderance of the evidence the truth of the facts supporting a protection order. *Maria A. on behalf of Leslie G. v. Oscar G.*, 301 Neb. 673, 919 N.W.2d 841 (2018). There is no dispute that the parties were family or household members for purposes of § 42-903 since the parties were previously in a dating relationship with each other. In his brief, Everett correctly notes that since Zoey did not allege that Everett caused her bodily injury or subjected her to non-consensual sexual contact, there must have been evidence of a credible threat placing Zoey in fear of bodily injury for the district court to affirm the ex parte order. The credible threat language in 42-903(1)(b) defining "abuse" for purposes of entitlement to a protection order means that the evidence at trial must include some threat of intentional physical injury or any other physical threat. *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014).

Everett analyzes each incident described in Zoey's petition separately and argues that the incidents cannot be viewed as a credible threat of physical injury, neither individually nor collectively. Everett references two cases throughout his argument: *Torres v. Morales*, 287 Neb. 587, 843 N.W.2d 805 (2014), and *Linda N. v. William N., supra*. The incidents reported in *Torres* included intoxicated arguments, yelling matches, and name-calling. There, the Nebraska Supreme Court determined that the trial court was correct in finding there was no credible threat because there was no "physical contact or threats of any nature made by anybody." *Torres v. Morales,* 287

Neb. at 593, 843 N.W.2d at 811. In *Linda N., supra*, it was reported that a minor child's father was verbally abusive to his daughter. The evidence at trial showed the father sent texts containing crude language and excessive name-calling to the minor child and that the child felt threatened by the texts. There, the Nebraska Supreme Court determined that since the messages did not reference physical harm, nor was there evidence of past physical abuse, the text messages alone did not constitute a credible threat.

Everett argues that the voicemail he left Zoey was not a threat that he would harm Zoey but was merely "relaying his belief that bad actions lead to bad fortune." Brief for appellant at 13. He contends that like in *Linda N., supra*, Everett's message merely contained crude language. He argues that even "[v]iewed collectively, Everett's conduct should not be considered abuse under § 42-903(1)" because "as established in *Torres* and *Linda N.*, the statutory standard for abuse requires more than disturbing or even morally abhorrent communications." Brief for appellant at 14. Rather, there must be "'some threat of intentional physical injury or any other physical threat.'" *Id.* Everett contends that "[t]he record simply contains no communications from Everett that reference physical harm." *Id.*

Everett is correct that there is no evidence that he communicated a threat of physical harm. However, as set forth above, a credible threat may be implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct that is made by a person with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. Here, Everett's communications and conduct together constituted a credible threat of physical injury sufficient to cause Zoey to fear for her safety.

Everett left Zoey a voicemail after his release from law enforcement custody, calling Zoey numerous names and stating that "'karma is a bitch,'" and, "'You'll get yours I promise you that.'" Although it did not contain an explicit reference to physical bodily injury, when viewed in the context of the other alleged events, Everett's message implied a threat of physical harm. Just before Everett was arrested, he called Zoey 22 times in the middle of the night. Everett used a "no caller ID number" because Zoey had blocked his number. When Zoey did not answer, Everett went to Zoey's home at 1:28 a.m. and knocked on her door for 30 minutes until law enforcement arrived. Zoey stated that she called law enforcement because she feared Everett "had a gun or had the intention of breaking into the house."

Everett had also displayed threatening behaviors in the past. For example, Everett had previously "threaten[ed] to come to [Zoey's] home uninvited." Zoey also stated that on multiple occasions Everett "tried to restrain [her] from leaving his presence." Zoey specifically detailed one occasion which took place in the summer of 2022, where Everett "grabbed [her] shoulders tightly" and yelled at her while "he was about an inch from [her] face." When Zoey tried to escape, "Everett attempted to restrain [her] at the door by pressing his body weight against [her]." Everett points out in his brief that there was conflicting evidence at trial about this incident. However, even on de novo review, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Torres v. Morales, supra.*

We therefore find the record sufficiently shows that Everett placed Zoey in fear of bodily injury by way of credible threat implied by a combination of Everett's conduct and communications. As such, there was sufficient evidence to prove abuse as defined by § 42-903 and the district court correctly affirmed the ex parte domestic abuse protection order.

CONCLUSION

For the reasons set forth above, we affirm the district court's April 6, 2023, order affirming the March 9 ex parte protection order.

AFFIRMED.